of Balance, Ms. Klein for the Appellant, Ms. Stepkin for the Appellant. Ms. Klein, please proceed.    Ms. Klein, should I begin? Yes, please. I'm sorry. I hope I'm audible. Ms. Klein, please proceed. Thank you. May it please the Court, Alisa Klein for the Government. In the statute that governs the Medicare outpatient perspective payment system, Congress expressly precluded judicial review of methods described in paragraph 2F, which when you flip to 2F are methods for controlling unnecessary increases in the volume of covered outpatient department services. That is what we have here. HHS found that the volume of a particular type of outpatient department services, routine clinic visits, increased unnecessarily because Medicare pays more when those services are provided in an outpatient setting than Medicare pays when the same services are provided in a freestanding doctor's office. HHS brought the payment rates into parity in order to eliminate the differential that was driving the unnecessary increase in the volume of these particular outpatient services. The rule is within HHS's authority. It would survive under the usual Chevron framework even if Congress had not explicitly prohibited judicial review. Plaintiff's lead contention is that Congress... Sorry. Do you bring them into parity by charging directly the same rate they would get under the physician fee schedule, or is your method to make some sort of adjustment to approximate the physician fee schedule? How are you actually closing that gap in practice? I believe the second description is more accurate, that it's a rate that is equivalent to what would be paid under the physician fee schedule. The district court described it under A135 as a physician fee adjustment, and it didn't sound like it was actually the same price. It just got closer to it, but are you saying that it is, for all intents and purposes, the same price? I haven't looked closely at this issue. My understanding is that, for all intents and purposes, it is the physician fee schedule rate. You just plugged that rate in? Again, Your Honor, because this wasn't a matter that was the focus of briefing, I don't want to overstate my knowledge, but my understanding at a general level is that it is, as a practical matter, the rate that would be paid under the physician fee schedule. In deciding whether it's a method or not, it helps me to try to understand exactly what's being done here. Do adjustments count as methods? There's other adjustments that are there throughout the statutory adjustments. Is a secretary-created adjustment a type of method within your definition of method? Method is, you have to look at it, the full phrase, method for controlling an unnecessary increase in volume. There's not a single method, or just to use the common English term, tool, means. There's not a single method for doing that. There are various ways that the agency can try to control an unnecessary increase in volume. The point of contention is essentially that Congress gave HHS one pool in its arsenal, which is an across-the-board rate cut. That would be the adjustment to the conversion factor. As the agency explained, the statute doesn't limit the agency to that type of broad volume control method, which here would unnecessarily penalize outpatient department services for all sorts of services that have not unnecessarily increased in volume. I understand that point. I'm just trying to get a general sense of how you define methods to control volume for shorthand right now. I'm not saying it would be exclusively adjustments. They're referencing the 9C adjustment to the conversion factor. I'm asking whether you include within your definition of available methods, tools, mechanisms, adjustments, such as right now my understanding is that for those non-exempted hospitals after 2015, the ones that came into being after 2015, a physician fee schedule adjustment is what's being applied. I'm trying to understand if what's going on here is also in your conception of an appropriate method, a sort of secretarial created adjustment. I don't want to use the word only because that's a term of art. Under the statute, methods for controlling volume is not a term of art. It's in ordinary English. What are you doing to control volume? You need the predicate finding the agency needs that there was, in fact, an unnecessary increase in the volume of particular services. So here we're just talking about one type of service, the routine clinic visits. Could a method include simply just not paying for a service? If the predicate finding were you had services being provided unnecessarily and, therefore, an unnecessary increase in the volume, then, yes, in theory, the determination could be we're not going to make that payment. In that respect, it's not the same authority, but it would parallel what happened in Amgen, where there was a determination that there was no reason to be paying a higher rate for Amgen's products. Because a similar, though not identical, product was available at a lower rate. So the agency simply eliminated the supplemental payment that Amgen otherwise was entitled to by virtue of Paragraph 6 of the Outpatient Prospective Payment System statute. But here, again, just to be clear, the 2015 legislation took those newly established off-campus outpatient departments out of the Outpatient Prospective Payment System for all of the thousands of services they provide. There are about 6,000 Medicare rates set each year for the outpatient system. And those newly established departments are getting, essentially, the equivalent of the physician fee schedule for every one of them. The rule at issue here is just applying to the other category of outpatient departments the same general Paragraph 2F authority that could be applied for any outpatient department, any service. And it's limited to one particular type of service that are these routine clinic visits. Essentially, someone goes in for a 15-minute appointment with a doctor, and that doctor may ask about the patient's medicines, and then the patient leaves. And the finding documented by various underlying reports was that there is no medical reason that that type of routine clinic visit needs to occur in an outpatient setting as opposed to a freestanding doctor's office. Can I ask one question, which is that in the statute you have the Provision T4, which pertains to, by terms, Medicare payment amount. And then it sets forth the way in which the payment amount is going to be calculated. And it has a bunch of finely reticulated provisions that cross-reference other paragraphs in 2D, 2E, but it doesn't reference 2F, which raises the question whether the absence of 2F in T4 means that Congress didn't contemplate that one application of 2F would be what's effectively an adjustment to the payment amount. Well, when Congress was giving this separate authority to control for unnecessary increases in the volume, that's getting at a different type of problem, which is, as an overall matter, are there ways to protect the Medicare trust fund when certain types of services are being provided unnecessarily? So you wouldn't expect to see a reference in other provisions, and Congress may not have anticipated what was not a problem until years later, which is that for these particular services, these routine clinic visits, you had essentially a perverse incentive introduced by a Medicare payment differential. But the language of 2F is very broad. It just devised a method for controlling unnecessary increases in volume, and the preclusion provision simply says, no judicial review of the methods described in paragraph 2F. Right. I think the language of 2F certainly is an error in your quiver, and I don't even think the district court or AHA, from what I can understand, denies that just on the bare terms of 2F, what has happened here can fit within that terminology. And then the question becomes whether, even though that may be true, other provisions in the statute tell you that the reading that the secretary has reached isn't consistent with the statute. And one possibility is the question about T4, and I take your response to 2F more broadly, and you wouldn't necessarily expect T4 to cross-reference 2F. I understand that response. And then what do you say about 9C, which is another provision that could be read to be in tension with the notion that 2F provides the authority that the secretary deems here, given that 9C speaks directly to what happens under 2F, but talks about a different response, which is to say an across-the-board adjustment to the conversion factor. So 9C is anticipating that you could have various methodologies under 2F. And that could include methodologies that come with a benchmark for volume reduction. And if those methodologies are unsuccessful, 9C explicitly gives the agency what would be very broad authority to do an across-the-board rate cut. But nothing in 9C takes away the authority to do something that's much more calibrated, which is what the agency did here. It's not penalizing outpatient departments for services for which there's not been an unnecessary increase in volume. It is, in a very targeted way, reducing the payment rate for a particular type of service for which there's been this documented finding of an unnecessary increase in volume. And that's all predicated on the determination that these routine services don't have to be provided by a hospital outpatient. They can just be provided by a regular doctor's office. Is there something in 9C that 9C allows that wouldn't otherwise be allowed under your reading of 2F? It's a good question. At least in theory, 2F would be broad enough to allow this across-the-board rate cut. But given that that's such an extreme measure, it looks like Congress was making explicit that you can even take the extreme measure that the agency has never done of adjusting the conversion factor. But what the plaintiffs are saying is that this is the exclusive measure, but by its terms, 9C is permissive. It just says the agency may adjust the conversion factor. And I don't understand the plaintiffs to be disputing that other direct forms of volume control, such as the packaging and bundling, that the agency has been using for more than a decade, are implicitly foreclosed by that permissive grant of authority in 9C. So I guess your bottom line on that is that, yes, 9C might be redundant of 2F, but that's okay. Sometimes that happens, and Congress wanted to make it particularly clear that this one specific authority is within the domain of the Secretary. Correct. But if you can, just to follow up, if you can use 2F to essentially target a specific service and functionally take it out of the OPS system altogether and throw it into here, the Physician Fee Schedule system, if you've got that much authority, you would never need to get to this point, right? You would never need to get to the 9C point. You would never need to. That's not right, Your Honor, because we're just addressing a very particular problem here. 9C isn't contemplating an unnecessary increase in volume of one particular type of Medicare outpatient service. Again, there are about 6,000 Medicare rates set each year. 9C is talking more globally. I can get that. How do we know 9C isn't talking about exactly what you're doing here? Well, surely if you tried something more within sort of the OPS system and it didn't work, you would say you still have the authority in this situation where you're targeting one specific service to use 9C. It would be rather draconian, as you said, but I assume you're not saying to solve the problem you've identified here, which is very service-specific, you don't have 9C authority? Is that what you're saying? That's not something the agency addressed. I want to be careful not to get out ahead of them, but the question here is whether there's something in the statute that forbids the Secretary from using this rate reduction as a targeted method of volume control when you have the predicate findings of 2F, an unnecessary increase in the volume of particular outpatient department services. And there's nothing in the text that says you have to figure this out. That's what I'm trying to figure out, right? We don't just look at the words of 2F. We have to look at the statute as a whole as how it functions. And so that's what I'm trying to understand. If your reading of 2F makes other protections that Congress clearly thought came sort of arm-in-arm with 2F, like 9C, that there's sort of a tag-team process there, at least as I read it, then you have a definition that says we can just pick a particular service and take it out of the office system and put it in a different payment scheme altogether, so you would never have the tag-team protections of 9C, then that sort of affects the legitimacy of your reading of 2F. So I don't think it's right to say that we don't need to talk about that just because 2F uses the word-like method that could be big and could be small. Looking at the statute as a whole, you have to have a reading of 2F that's consistent with 9C. I'm trying to figure out how taking a payment functionally, or maybe just directly, you may be saying functionally, actually out of the office system and putting it in a different payment system is consistent with this structure. Because the general, the broad directive is to control an unnecessary increase in the volume of covered outpatient department services. And if what you had were an across-the-board unnecessary increase, then you could use the permissive authority in 9C to do an across-the-board rate cut. But that permissive authority isn't the exclusive method. Again, I just want to emphasize that the agency has used other direct methods of volume control, such as the packaging and bundling of Medicare services. Is there anything other than this situation and the packaging? Are those the only two, or are there other ones? Those are the ones I'm aware of. But the agency hasn't encountered an issue like this until recent years. This problem was reported by MedPAC in 2012, and then HHS, beginning in 2014, gathered data to get a more refined understanding of exactly what services we're talking about and which ones can be safely provided in a pre-standing doctor's office. So it was a multi-year process to gather the information. But this, to my knowledge, is the first time you had a finding that the reason particular services were unnecessarily increasing in volume, particularly outpatient services, was because of a payment rate differential between the outpatient rate and the Medicare fee schedule, the physician fee schedule. So this is... Well, what if the Secretary just at some point said, here's a procedure that I just don't think should be performed in outpatient clinics at all. It's just not appropriate for outpatient clinics. It's a, I don't know, sort of a blood transfusion or something, just come in and get blood transfused. I don't think that needs to be done in clinics at all. And so any conduct of that procedure is too much volume. There just should be zero of that in outpatient clinics. And one would be excessive volume because it should be zero. And so if someone does that procedure, blood transfusion or whatever you want to hypothesize, we're not going to pay it under the OPS system. We'll pay it under the physician fee schedule or some other schedule. Did the Secretary do that under QF? If you really had a documented finding that it's medically unnecessary, then yes. But here, the idea is that the site... The Secretary can, under QF, simply go through and target specific services and say, and give a reason, create an APA record as to why they just don't think those things should be done there. And QF allows them to just say, you're out of the OPS system. I want to think about it more because it's a method for controlling unnecessary increases in the volume of covered services. And so I take the question to assume that it's medically unnecessary to provide these in outpatient departments. Well, that's what the Secretary thinks. But they're covered services. They're in outpatient departments. They're legitimate medical procedures. It's not a real medical procedure. And so, yeah, the Secretary just makes a judgment that this covered service, I'm kicking it out of the OPS system. I'm just thinking by analogy to Amgen. And what Amgen did was say, the Secretary said, we're not paying extra for Amgen's product because a similar product that's less expensive is essentially good enough. And this court didn't explore whether the Secretary could have gone farther and say we're not going to pay Amgen at all. And I can't think of why the Secretary would have said that. So Your Honor's hypothetical sounds a lot like that. I don't know why the Secretary would – that wouldn't be a volume control method. The Secretary isn't saying there's something inherently problematic if these services are provided by outpatient departments, but it's dealing with a perverse incentive that caused an enormous increase. No, no, I'm trying to understand. I understand. I understand here. You've categorically kicked these things out of the OPS payment system. And I'm trying to understand. And here you've done it because the Secretary looked at statistics and attributed those to what you call a perverse incentive. And I'm just trying to make sure I understand, then, that your position of what 2F method allows you to do is to target particular services and make a determination that those are – for whatever justification is offered, there's too many of those happening in outpatient systems and then categorically kick the entire procedure out of the OPS system or service, however you call it. That's exactly – because that's what's done here, and that's functionally – the only difference in my hypothetical is a different reason is given, but otherwise it's the same to what's happened here. Let me try to explain why I'm reluctant to go from what actually happened here to the hypothetical. So here the finding was that the higher rate was driving a shift in the site of service and that that was an unnecessary shift. And the method was calibrated to the payment differential that was driving that unnecessary shift. If I understand the hypothetical, the Secretary would be using a much cruder instrument that went well beyond what was necessary to control the unnecessary increase in volume. And that's why – That's not the hypothetical at all. No, the hypothetical at all is that this is not something that I think is necessary. It's functionally what the Secretary is saying, this shouldn't be a covered procedure by the OPS system. This just should not be a covered procedure in the OPS system because it's not necessary to be done in outpatient departments. So even doing one is unnecessary. The service is out. You can get it compensated under some other – whatever other system that the Secretary points to. One of the things that the agency would consider would be the effect on beneficiary access to the service. And so, again, this is why I'm reluctant to jump out ahead of what the agency is saying. I'm not asking you to address whether there might be other attacks on this under the APA or whatever, but I'm asking you to give me your conception of what 2F allows. I'm sorry to keep repeating myself, but I'm really trying to understand. It seems to me that what's happened here is the Secretary's made a judgment that when we allow this service to be paid through the OPS system, bad things happen. Bad things volume-wise happen. There's a perversion incentive when we get this massive increase in volume. So we've got to take it out of the OPS system. That's the only way to control the volume. And if that works there, then all I'm asking is whether it works for other rationales as well. But at the bottom, your judgment here is if we think there's too much volume, whatever the reason, let's assume it's a reasonable explanation for the increase, the too much volume, we can just take it out of the OPS system. That's right? That sounds broader than what the agency concluded in the rulemaking, which is essentially that the very thing that was driving the unnecessary increase in volume here was the payment differential. And so that was the targeted response to eliminate that so you stop having this incentive for services to shift from doctor's offices to OPS. That's another way of saying the same thing, isn't it? We're going to eliminate the payment differential by kicking that service out of the OPS system and putting it in the physician fee schedule. I don't understand why you're resisting that. I understood the court's hypothetical to be saying we're not reimbursing outpatient departments, period, like they're paying $0, which is not what the agency did here. The agency said we're getting rid of the differential that was systematically driving a shift in services from doctor's offices to hospital. I'm sorry. My hypothetical was we'd just get paid under Schmutter's system, but it's not going to be part of OPS and take physician fee schedule. I don't know what other systems are out there. You probably do, but I don't. But it will be some other thing. People will get the service under my hypothetical. It's not going to be outpatient. If outpatient departments do it, we're not going to pay for it. But they can get the service. We think they can get a physician office. And put aside other challenges like accessibility, the conception of the 2F power is the same, is it not? Well, if you're talking about a tool that is targeted to control an unnecessary increase in the volume of a particular outpatient service, then, yes, it would be within 2F. And I'm just being careful because we're imagining a situation not present. I don't know if all of those predicates would be satisfied. And, again, I'm not conceding reviewability. I'm talking about when the agency is itself deciding, do I have authority to do this or not? That would be the thought process that the agency would have to go through. And I just want to back up because we do have a preclusion or review provision here that's very broad. It just says methods described in paragraph 2F. And as this court and the Supreme Court have both noted in recent decisions, when you look at an express preclusion or review provision, you're also thinking about the nature of the agency action. And what you have here is year after year the agency sets rates in advance in a very short time period. And the idea is that these are published so that all of the participants know about them in advance. Congress, practically every year, amends this outpatient prospective payment system statute. So what Congress is essentially saying is I, Congress, will be the one to oversee systematic cross-cutting issues that could arise in the administration of this program. Congress has not set up a practical way for orderly judicial review, which is why, as this court has previously recognized, issues of remedy become extremely complicated and burden the Medicare Trust Fund administratively when what you're talking about is after the fact, setting aside a rate that was set in advance for cross-cutting purposes. Thank you, Ms. Carlin. Let me just make sure that my colleagues don't have further questions for you before we'll give you a rebuttal time, but further questions for you before we hear from Edmond. Judge Carlin, I just have one question on this last point. Would you agree that before we decide that it's unreviewable, we have to decide it's a method described in paragraph 2F? Yes, because that is what dictates whether the preclusion provision governs. But on its face, 2F speaks of methods for controlling unnecessary increases in volume, and we don't think when Congress set up the various Medicare preclusion that it was anticipating that a court might nonetheless come in after the fact and set aside cross-cutting rates, that if you just look at all of the preclusion of review subparagraphs, what they're getting at are these cross-cutting rates that are set in advance and that unraveling would be very difficult. So what Congress did leave open in the terms of judicial review are after-the-fact concrete disputes that are individualized issues, such as you didn't provide adequate documentation, but I'm just now talking about the general structure of the Medicare review provision. I'm not seeing that from the text. The text just says there shall be no administrator review of dot, dot, dot, methods described in paragraph 2F. It doesn't say anything about cross-cutting rates. It doesn't say anything else. It just says those are the things that we can't review. So following Jen and Tom's stat in the other cases, don't we have to decide that this is a method for controlling unnecessary increases in the volume of covered OPD services in order to decide that it's not reviewable? Yes, but the dot, dot, dot is important. What I'm talking about is if you look at the structure, the broader structure of the preclusion of judicial review, where just looking at that paragraph A, you can't review the development of the classification system, including the establishment of groups and relative payment rates and wage adjustments and other adjustments, which include equitable adjustments, and then it goes on below, calculation of base amounts, et cetera. My point is Congress has set up a scheme, understanding that the agency sets these rates year after year in a hurry. Congress has precluded review through an array of provisions of the cross-cutting issues, and this is just one of the cross-cutting issues, which is a volume control method that affected the rate for a particular type of service. Okay. If my colleagues don't have further questions at this point, then we will hear from Ms. Stetson and we'll hear from you again on rebuttal. Ms. Klein, thank you. Thank you. Good morning, Your Honors. Can you hear me? Yes. Okay. Good morning. It's Kate Stetson representing the appellees. I'd like to start by talking about why, from the plaintiff's perspective, Ms. Klein may have been resistant to a few of the questions that Judge Millett and Judge Srinivasan were asking. Judge Millett, you asked the first question was whether or not this method was an adjustment. And I think the reason that Ms. Klein was resisting calling this an adjustment has to do with Chief Judge Srinivasan's second question, which is under T4 of this statute, the statute plainly says the amount of payment made from the trust fund, et cetera, is determined, subject to an unapplicable paragraph, as follows. And what follows is a very specific list, as Chief Judge Srinivasan said, of these schedule adjustments, all of which are taken into account by the other things the statute talks about, including the conversion factor, the wage adjustment, the outlier adjustments, the equitable adjustments under T2, D, and E. It then goes on to explain you subtract the deductible and you apply a payment proportion, and that's how you get the Medicare payment amount. That is the way the amount is determined. Now, for the amount to be determined by something other than what is contained in T4 is improper. And that, I think, is why Judge Millett, Ms. Klein was also resisting your questions about kicking something out of the OPS system. That is, in fact, essentially what the secretary has done with respect to this specific service because this specific service, as you pointed out, is now paid. I think the exact words are equivalent to the fee, the physician's fee schedule. But going back to the statute, T2 begins system requirements under the payment system. And then there are a list of the things the secretary has to do. And one of them, of course, gives the secretary authority to make a series of adjustments. And one of them gives the secretary authority to adopt a method for controlling unnecessary increases in volume. So the problems, we think, under the statute with what the secretary has done here are multilayered. They do not comport with a method under the system because, of course, this method has taken this particular payment out of the OPS system altogether. They don't comport with T4 because there is nothing in T4 that gives the secretary the right to import a method for controlling volume into determining the payment amount. Ms. Shrinivasan, you also asked about 9C and whether it was in tension with the theory that the secretary was espousing about what 2F can and can't do. Can I ask you one question before you go to 9C? And I do want to hear your response on that. But on the T4 point, is it your understanding that 2F would stand alone in this regard under the statute? In other words, that T4 provides the entire mechanism for determining payment and there's nothing else that's not cross-referenced in T4 that could affect the payment? That's right, Chief Judge Shrinivasan. And I think that's one of the reasons why the T4 itself has so much baked into it. There is an aside that I mentioned earlier subject to paragraph 7 that explains in what circumstances that particular inapplicable instance changes the payment. But under fee schedule adjustment, everything that you see there in that sentence, the Medicare OPD fee schedule amount computed under paragraph 3D, and that is what bakes in the conversion factor, is adjusted for relative differences in the cost of labor and other factors determined by the secretary as computed under paragraph 3D and 2E. And 2D and E, of course, take care of the wage adjustment factor, outlier adjustments, pass-through payments, other adjustments as determined to be necessary to ensure equitable payments, adjustments for certain classes of hospitals. So that one subparagraph of the payment route already has a whole bunch baked into it and then the payment amount goes on to say you determine this by subtracting the deductible and applying the payment proportion. So that's it. And I think that the reason that this is not just a method but an adjustment, those two aren't binary, of course, is that this is a service-specific, as Ms. Klein said, a targeted adjustment in the payment rate for a particular service. And Chief Judge Kronosoff, that doesn't just pose a problem of redundancy with section 9C. Sorry, just one more question before you go to 9C, and then at least I'll let you go to 9C. On this point about whether T4 occupies the field in terms of payment amounts, so, for example, in the indented tier brief at 14, the statute contains a provision that deals with special payment rule. This is 16D for rural hospitals. Yes. So that one, at least by terms, isn't covered under T4. And so at least it could be read to suggest that T4 doesn't necessarily occupy the field to the exclusion of doing something with respect to payments under QF because... I think you know where I'm going, but I'm just curious to hear your response. I actually think that is covered under T4 because if you flip back to section T2E, what you see there is that list of adjustments that I mentioned earlier, and the very last one is other adjustments that are determined to be necessary, such as adjustments for certain classes of hospitals. I do think that T4 is designed, with some exceptions noted therein, to cover the waterfront, but more importantly, what it doesn't mention, when it mentions specifically 2D and 2E, is 2F as another method of adjusting the payment for a particular targeted service. Does that answer your question on T4? Yes, at least with respect to 16, that answers it. Thank you. Okay. The other redundancy or superfluity I wanted to mention isn't just with respect to 9C, as Chief Judge mentioned. It also has to do with 2D and 2E itself and the way that section 9B, the budget neutrality provision, plays into that. One of the themes of our brief is that the Secretary has two ways, not just one way, as Ms. Klein said a couple times, but two ways that it can make adjustments to payments. It can make adjustments that are budget-neutral and that are targeted, that can be service-specific, they can be equitable adjustments as an Amgen, but those adjustments, those targeted adjustments, have to be budget-neutral. That's under 9B. The other way that the Secretary can make an adjustment is by adjusting the conversion factor, that across-the-board factor that applies to every payment under the OPS. And that conversion factor, what the Secretary has said over and over again, right up until 2015 when Congress passed a statute that didn't do everything that the Secretary wanted it to do, was that the methods for volume control articulated in 2F authorized the Secretary to update the conversion factor. And you can see this actually in the Federal Register sites that the Secretary himself articulates in the final rule. And these are all cited in our brief as well. I can give you the sites. In 1998, and this is at pages 21, 31, and 39 of our brief, the Secretary explained that T2F allows the Secretary to develop a method for controlling unnecessary increases in volume. In addition, if the volume of services increases beyond amounts established through methodologies determined in 2F, Section T6C provides that the update to the conversion factor may be adjusted. The Secretary said the exact same thing in 2000, 65 Federal Register 18434. The Secretary said the exact same thing in 2001, 66 Federal Register 59856. In 2014, the Secretary... Ms. Stetron, it's Judge Garland. All of that seems to be just a repeat of the language in C. Is that right? It is all a repeat of the language in C, but what's important, I think, is what's not said there. And this goes, I think, to a couple of Judge Millett's questions earlier. But let me, if you don't mind, ask a question about that. He says, if the Secretary determines that the volume of services comes under methodologies described in 2F, that the volume of services paid for under this subsection increase beyond amounts established through those methodologies, then the Secretary may appropriately adjust the update. I stuck in the word then because it's sort of an if-then. That suggests that the adjustment is what the Secretary does if the Secretary first uses the methodologies and the volume still increases beyond what the Secretary thought. It doesn't sound from the text like the adjustment to the conversion factor is the only way in which to handle volume. Am I right about that? Judge Garland, I think there are two different strands to that answer. The first is, I don't think that we need to argue that the adjustment to the conversion factor is the only way, is the only method to control volume. And that's because, as we acknowledged in our brief, I think there is some dissonance between talking about the methodologies in the Section 2F and a method of controlling volume, which is what 2F says. I understand that, but assume for the moment that I don't agree with the distinction between methodologies and methods, that I accept the-I'm not saying I do, but assume for the purposes of the question, that the government's description of methodologies, the meaning of the word is one we're adopting for purposes of this question. But there's not a difference between the first methodologies and the second methodologies, or about methods and processes, et cetera. I think my answer-the second strand of the answer would still be the same, which is that we don't need to establish or to concede the opposite of that the conversion factor adjustment is the only method of volume control available to the Secretary. The Secretary himself has spoken, you know, over the years in Federal Register notices of trying to find other methods of volume control, including things like a now obsolete volume control metric that was used on the Physician Fee Schedule side. My point in reciting all of those Federal Register notices to you, though, is what's not in there. And what's not in there is any acknowledgment that that sub-provision, or method of controlling volume, actually contains a silent way to adjust a payment that isn't present in any of the other specific adjustments in the statute. And I think this is ever more- So what you said, you're not going for the-the only thing they can really do is the 9C across-the-board adjustment. And so what other-what under 2F could they do to address this problem? Well, I think as Ms. Klein said, they really haven't done much yet. I think one of the- What do you think they could do? I think- What would be permissible? I think what is permissible are the things that the Secretary has done. The Secretary has described, the District Court described, something called packaging, which is essentially- Right, but that's not going to address this volume problem, I don't think. Do you think- I think the Secretary himself has said this has addressed the volume problem. This is why the Secretary- I'm talking about the problem in front of us here, where what they call the perverse incentive, the shifting of services that could equally be done in a physician's office for much cheaper.  but take that as a given. What could be done to address this specific problem, which I don't think bundling- I can't conceptualize how bundling would do, other than getting rid of that price incentive somehow. I think what can be done- and you could get rid of the price incentive, you just have to do it in a budget-neutral way. And that was my point earlier about 2D and E. There are adjustments that are available to the Secretary, including the equitable adjustment that Ms. Klein mentioned that was put to use in Amgen, that permit the Secretary to make targeted adjustments to payments for particular services. But what the Secretary can't do is make a non-budget neutral targeted adjustment that takes you outside of all of the other adjustment authority the Secretary has. And I think this is brought home by- The Secretary- Go ahead, finish your sentence, I'm sorry. No, please continue. Tell me what brings it home. You were about to say what brought it home. I didn't mean to interrupt you. What brings it home is another element of the statute, of course, that Ms. Klein and the panel haven't yet discussed, which is Congress's actions in 2015, the Section 6- Okay, before we jump into that, could there be a permissible method if the Secretary, instead of sort of categorically  said, for this category of payments, you have to do an extra paperwork to get them compensated? That is, you have to show, you have to include an explanation or justification of why this needed to be done as an outpatient service rather than a physician's office. Would that be an appropriate method? Well, first, I heard the bell. Is it okay if I continue? Yes. I think the answer is yes. And this is actually something, and I can't put my finger on which Federal Register notice this appeared in. I think it was an early one, like circa 1997 or 98. But the Secretary actually talked about the possibility of using preauthorization as a method for controlling volume. And you can see quite easily how that would work. If you have to call and get permission to go to a hospital outpatient clinic for clinic services, that would tend to cut down on volume. I think the reaction to a preauthorization requirement specifically in light of the administrative burdens that Judge Millett just mentioned was that that really wouldn't be a workable or tolerable thing for hospitals. But that is an example of something that... Right. So instead of preauthorization, I'm putting the burden on the outpatient clinics as part of sending in their submission for Medicare payment to, you know, have to... And presumably it would be a narrative. They come up with some code system. You have to put these extra codes in and those codes identify the reasons why this had to be done by the outpatient department. And could they say then... If they could require that, could they then say, if you don't do that or we don't think the justification was sufficient or appropriate, you won't get paid at all for that service? I think that... I think that this starts verging into a very different set of reimbursement questions. You know, when something is coded a particular way or coded the wrong way and the Medicare review contractor concludes that it's been coded the wrong way. But I think at bottom, imposing an administrative requirement like preauthorization, like additional documentary support, is something that the secretary has... Well, I'm trying to have a little more force behind the paperwork here, right? Everyone says fine, paperwork. We do that all the time. A consequence for not... Could a consequence for not... Either not doing it or it's not credited. The paperwork is not credited. They just don't agree that it was justified. Could the consequence be nonpayment or, say, a 40% reduction in payment? I think that a consequence of failing to put in appropriate administrative paperwork could lead to nonpayment or a reduction in payment. I think that happens quite frequently when a Medicare contractor decides that something hasn't been adequately documented. And I think imposing a burden... Isn't that functionally what happened here except they're not doing it on a case-by-case basis? They made a judgment that I don't care what codes you put in, these particular, I forget what they're called, evaluation visits, they're not necessary to be done there. We've made this in advance and we're effectively imposing a 40% rate cut. You can't... There's no way you're going to justify it. We'll save you the paperwork. But they can't be justified and we're doing a 40% rate cut. No, I don't think it's the functional equivalent of that at all, Judge Millett, because I think before they could impose an across-the-board, targeted, service-specific, nonbudget-neutral rate cut, they would need to come within the payment directives and if they only hypothesized, they wouldn't be subject to budget neutrality. It's only because they're doing it sort of categorically across the board that they're subject to budget neutrality? If they do it case-by-case, I think the hospitals would have other avenues of pursuit, including a different avenue to judicial review, to challenge those decisions as being not in conformance... Can I ask you about that? The case-by-case approach that would be a legitimate method to have... I think there are too many other considerations wrapped up in the kind of administrative and reimbursement requirements for me to say that that is a quote-unquote method of volume control. What I can say is what the Secretary has said, which is first, they haven't really used this much before, and second, that preauthorization, that kind of administrative burden, that cost-by-tiny-cuts idea of imposing the rate cut singularly across every hospital, I think would pose a whole host of other problems. Of course, this is nothing that the Secretary has attempted to argue here. I want to talk, too, about Ms. Klein's statement that the agency hasn't encountered an issue like this before, an issue where evaluation and management services within a clinic as opposed to a hospital is a problem. The reason that Ms. Klein mentioned those 2012 MedPAC reports I think is significant because those MedPAC reports, of course, are what led in a straight line to Congress's enactment of Section 603. When Congress enacted the section that essentially grandfathered existing and later mid-billed hospital outpatient departments into the physician's fee schedule, they had two different voices in their ear. They had the MedPAC voice saying Medicare is paying too much for exactly these services, evaluation and management services done by hospital outpatient clinics, exactly what we are talking about here. The other voice, of course, in the ear is what the hospitals were saying, which is we need these outpatient clinics. These are rural areas. These are underserved areas. These are communities. If you look in the declaration supporting our complaint, you'll see really stark examples of some of those. Balancing those two voices, what Congress did was to make a very stark Solomonic choice. What Ms. Klein said was they haven't encountered an issue like this. They haven't encountered the issue until 2015 because HHS apparently was not satisfied with what they found. I think I, at least for my purposes, I understand the argument about 603, but I have just a broader overarching question, which is do you agree that in trying to understand whether the 2F authority encompasses this and assimilating your suggestions that there's other provisions in the statute that would suggest that it doesn't, that we apply Chevron? Yes, for a couple different reasons. One of them is that to the extent that the agency has even claimed Chevron, it's done so in the weakest of fashions here. I think it was a sentence that was brief. Let's assume that there's no dispute about whether  and that Chevron's squarely in play for us, but are you making the argument that you don't apply Chevron? I am, because that comes down to the fact that, as Judge Garland mentioned, we have to walk through the preclusion on judicial review before we get to the merits here. One of the things that the Supreme Court recently unanimously said in Smith v. Berryhill is that an agency doesn't get deference when a court is examining the extent of its own ability to apply judicial review provision. When you have the review provision meshed with the merits the way that Ann just suggested we do here, it seems sort of odd to say that Chevron wouldn't apply because you'd be saying that Chevron didn't apply because you're dealing with a provision that precludes administrative and judicial review, in other words, giving more authority to the agency. It seems a little bit odd to say in that context, well, that's a situation in which you wouldn't apply Chevron and you would apply something that's stricter by way of review. We have the Arlington problem, which is that the scope of the agency's statutory authority, which is what is being raised here, is subject to Chevron. We also have our own opinion in the Association for Lutherans which applies Chevron. I'm not sure how we get away from using Chevron to determine the question of whether this is covered by... That's Judge Garland speaking. I'm sorry. Yes, Judge Garland. I understand. The City of Arlington, I think when you put it next to Smith v. Berryhill, I think the takeaway, and this goes to the Chief Judge's question as well, is that attached to it has to govern the inquiry. I don't think it's possible to switch midstream precisely because it's meshed with the merits inquiry. All of the times this court has said, last year in American Clinical Laboratory Association, when a judicial review statute is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles that come from Kusana v. Holder, the Supreme Court case, but it comes from American Clinical Lab v. Azar from last year. The same thing was said in Amgen. There is a strong presumption that Congress intends review of administrative action. I think when you take all this in a broad context, what that leaves you with is you walk into any preclusion on judicial review with a strong presumption in favor of administrative action. The situation for Lutheran's case, Judge Garland, was a little bit different because if I remember correctly there, that was a Postal Service case and the Postal Service actually was completely outside of other statutory avenues for review. They didn't have that kind of preliminary question about whether the judicial review statute applied or not. It was quite plainly not applicable. That's, I think, why Eight Association just went right to the Chevron inquiry and got this judicial review statute. It demands a presumption in favor of it. I think the Amgen case and American Clinical Lab itself actually examine a text that is arguably ambiguous. You can see that from American Clinical Lab's discussion on its face and determines that it allows for judicial review. That's why I think Chevron, in these narrow circumstances, and they are unusual, as Comcast said, when it engages with the jurisdictional question, that presumption in favor of review trumps deference to the agency. The agency makes an equitable adjustment under 2E to target a particular service. In the formulation of it, it messes up the budget neutrality end of it. They don't disavow it. They just mess it up and don't implement it properly. Would that be... Would we have judicial review or would that mess up be the type of thing... It's clearly an equitable adjustment. It's clearly within the terms of the bar on judicial review. That mess up in administration would just be the thing we can't review under the system because they wouldn't be deciding whether it's an equitable adjustment. I think that there still would be an avenue because of what Section 9B says. If the secretary makes adjustments under subparagraph A, which include that whole nest of adjustments that are specified in the statute, then the adjustments for the year may not cause the estimated amount, et cetera, et cetera. This is the budget neutrality provision. If the secretary makes an adjustment that purports to be under subparagraph A, an equitable adjustment, but causes the estimated amount of expenditures to go out of whack, then I think it would be reviewable because it conflicts with the plain language... Then that makes everything where there's an argument that you violated the statute reviewable. I have thought the reason we had review here is because there's no dispute that there's a bar on judicial review of methods. If this is a method, there's no review of how well or swappably or reasonably adopted the method. By the same token, I would have thought that if they did an equitable adjustment, there was no doubt it was an equitable adjustment, then we wouldn't have jurisdiction. The whole point of the jurisdictional bar here, the jurisdictional bar is as exclusive as can be. There's no need for presumption. That bar itself, we just have to figure out whether it's a method. Once they do that, if they do something wrong, if they do an equitable adjustment, that's what they did and they just mishandled or misstepped accidentally in administering the budget neutrality at the end of it. This is actually where another twist in this argument comes in. It has to do with the Secretary's argument about the right ultra-vera standard. I think, Judge Millett, there is still a path for review there. It comes from starting from Chamber of Commerce that if an agency openly violates a clear mandate of a statute, even a preclusion of judicial review will not bar judicial intervention. Same thing in the DCH case from last year. Even if this is a separate analysis in the opinion after it decides the judicial review bar was there, even if the bar on judicial review applies, the argument that was being made by the appellant there still has to set aside the calculation as ultra-vera because it failed to use appropriate data. Same with American Clinical Lab. There was that discussion of the presumption in favor of review. Review was found available there and the panel went on to discuss a different argument. Even if the limitation applies, we should nonetheless review the rule because it's ultra-vera. The reason I'm emphasizing all those even ifs is because that is where judicial review kicks in. If you were to conclude that the secretary in your hypothetical had made its adjustment pursuant to the equitable adjustment authority, no question there, therefore the preclusion on judicial review applies, that triggers the even if phrase. If an agency openly violates a clear mandate of a statute, even if... Is every arguable accident and misstep an open violation? No. I don't think that, but I think your hypothetical was that they had made an equitable adjustment that was demonstrably not budget neutral. I think when you have an equitable... Accidentally misstepped in how they put that into effect, how they administered it. I don't think that there's an intent requirement here. What the budget neutrality adjustment says is if the secretary makes adjustments, they may not cause the budget to go out of whack. It doesn't matter whether the secretary did it on purpose or as a mistake. That would be a violation of the statute despite the preclusion on judicial review. But of course here, our entire argument is what Judge Garland talked about, which is before we decide whether this is reviewable or unreviewable, we have to decide whether this is an appropriate method. And for all of the reasons that we've talked about, this method of volume control, which is not tolerated or explained anywhere else in the statute, is not an appropriate method of volume control. If I could, I want to make one last point based on something that Ms. Klein mentioned. She mentioned how important it is that Congress oversees these systematic cross-cutting issues and how much work it does every year after the OPS schedules are published to revise or clarify certain things. That makes our point about Section 603 perhaps better than we could, which is when Congress looked at exactly this issue using exactly the reports that are cited in the appellants briefs here, it decided to make the cut where it did. And further, when CMS attempted to bring in to that new payment system, the fee schedule, the mid-billed hospitals, Congress acted again and said, no, these are subject to the OPS system. That is Congress using cross-cutting oversight to make a very specific point about what hospitals within the accepted category get paid and what they get paid outside of that category. If there are further questions. Let me just ask if my colleagues have any further questions. Thank you. We appreciate your argument. Ms. Klein, we'll give you your rebuttal time of three minutes. Thank you, Your Honor. Just a few brief points. On Chevron, there's no question that the 2F instruction to the agency to develop a method for controlling volume would be entitled to Chevron deference in the ordinary framework. That's not taken away when Congress precludes judicial review. And that would be paradoxical if Congress is trying to increase the agency's latitude and ensure that you don't have disruption by litigation, the normal Chevron deference doesn't go away under those circumstances. To address Judge Millett's hypothetical about the preauthorization paperwork, that is functionally the determination that the agency made here in advance. These particular visits and the way they're coded already takes into account complexity. The agency has already made the determination that these visits do not have to be provided in an outpatient setting. And so there was no reason to put in an extra step of saying an outpatient department document on a case-by-case basis why you needed to provide these in an outpatient setting. The argument about how P4 provides a reticulated method for determining a payment amount is parallel to the argument that was rejected in Amgen. There, Amgen said, if you look at T6, it provides a reticulated method of determining the payment amount, the supplemental payment amount. And this court correctly recognized that the paragraph 2 there with E, authority is a qualification that flows through to the provisions that follow, even though T6 didn't have an explicit reference to 2E. The same is true of paragraph 2F here. That is a broad authority that the agency can use to qualify the instructions that follow elsewhere in the statute. And finally, we've addressed Section 603 in our brief, and the plaintiff's description of what Congress did does not line up with the statutory text. Congress took a category of outpatient departments out of OPCTS for every service they provide, the thousands of services they provide. That's not something that the Secretary could have done as a volume control method because there was no finding that all of the services were being provided unnecessarily. That was a judgment for Congress. But at the same time, Congress left that type of fact-intensive judgment about a particular service to be made by the Secretary with respect to the preexisting outpatient departments, which are subject to the same volume control authority as on-campus outpatient departments. Essentially, you know, all the other providers. Can I ask a question? I have another question. So the hospital described this as taking these payments out of the out system and putting them in the physician fee schedule. And I had done that in some hypotheticals. But is that right or wrong? When I'm trying to understand this payment scheme, I apologize. It's a bit more... It's just hard for me to penetrate through all of it. Even if they get what is functionally the amount that's on the physician fee schedule, do they still get other ops adjustments like the rural hospital bump or an outlier payment or something? Do they still have... Do they still end up getting more... They're not kicked out of all that, right? I know all the payments get grouped together. You don't get adjustments for individual payments. But is there... I'm trying to understand whether this is taking a service out or whether it's simply controlling payment within the system. And I just don't have a sense of how to figure out the difference between the two. Well, the second. As a formal matter, what's happening is just that the payment rate that they're getting under ops has been lowered to bring it into parity with what they would get if they were under the physician fee schedule. So there's no other change to their place under the ops system. And when you get some of these other adjustments, are they sort of across the board or are they... Are there adjustments that are tied to particular services that are rendered including these services? I'd have to think about that more in general there across the board. You know, so wage adjustments, things like that, they're not service specific. But I'd have to think about whether there are any that could be... I thought some of that... I thought there was... I am really... I suspect I'm somewhat out of my league here. But I thought there was some for, you know, based on how many sort of poor patients you're serving. Oh, I thought you said service specific but it would... It would... These services that would... You know, if these services, these evaluation and management services were going to a high population of poor individuals who may have nowhere else to go at least indirectly would still be affecting this payment? Is that the wrong way to think of it? Yeah. No, I don't see why Medicare dish payments would be affected by this particular volume control method. And just finally the point... Does the plaintiff acknowledge that this rate reduction would be perfectly appropriate if it were done in a budget neutral way? But Congress, although it explicitly required budget neutrality in the exercise of various authorities for 2F it conspicuously did not. And that's because what you're... What you're dealing with here are services that are unnecessary to provide. And by controlling that unnecessary increase the whole purpose is to control overall spending out of the Medicare trust fund not just to move money around. So that is... I'm sorry to... I'm sorry to pile on right at the end here but isn't part of the problem here this sort of categorical judgment that these are unnecessary which would be different from pre-authorization or you know if you've got... We talk about rural hospitals it may well be that outpatient departments are the only things accessible to some communities in this country or they just don't have physician office options either due to transportation or other sort of affordability constraints on individuals. And so I mean isn't that the problem here that having this categorically? I mean do you really agree that every single time that no evaluation of management is ever warranted within an outpatient department? Well because the agency did not eliminate the ability of outpatient departments to provide these services. It eliminated the incentive to shift them from pre-standing doctor's offices which are generally more accessible to hospital outpatient departments. If they need to do it in the outpatient departments for either a complexity of the individual's treatment or that's the only service within 50 miles then one of the reasons for the higher charge is that they've got, you know, it's an outpatient of a hospital. It's a lot more regulatory requirements that don't go away. So this is part of the years of data gathering and refinement of this volume control method was designed first to make sure that we were not talking about complexity. If you have more complex services they're not going to be coded under these management codes or routine clinic visit codes. And as I said it's always something that the agency looks at. So that's yet another thing it looks at in calibrating the volume control method. But here the plane of submission is essentially the agency's hands are tied regardless of whether there is an increase      volume. So if you have a large number of patients and doctors offices you cannot use a calibrated method to address that particular problem. Thank you. Thank you, Ms. Klein. If my colleagues have no further questions. Thank you to both counsel and we'll take the case for their submission. Thank you.
judges: Srinivasan, Garland, Millett